

SEALED



# 84719

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2015 SEP -1  AM 11:14

DEPUTY CLERK_____

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, TENNESSEE, TEXAS, WISCONSIN, the Commonwealth of MASSACHUSETTS, and the DISTRICT OF COLUMBIA *ex rel.*, JANE DOE  and JANE ROE, | § § § § § § § § § § § § § |
| Plaintiffs, | § § |
| v. | § § |
| ESSILOR INTERNATIONAL, ESSILOR OF AMERICA, INC., and ESSILOR LABORATORIES OF AMERICA, INC., | § § § § |
| Defendants. | § § § |

Civil Action No. _____

**3-15CV2853-P**

## **COMPLAINT OF THE UNITED STATES**

## **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**

The United States of America (the "United States") and the Plaintiff States (defined below) (the United States and Plaintiff States are collectively referred to herein as the "Government"), by and through their *qui tam* Relators, Jane Doe and Jane Roe (the "Relators"), bring this action under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "False Claims Act" or "FCA") and the false claims acts of the respective Plaintiff States, against defendants Essilor International ("Essilor Int'l"), Essilor of America, Inc. ("Essilor of America"), and Essilor Laboratories of America, Inc. ("Essilor Labs," and, collectively with Essilor Int'l and Essilor of America, "Essilor" or the "Company" or "Defendants") to recover all damages, penalties, and other remedies provided by the False Claims Act, and analogous state statutes,[1] and for their complaint ("Complaint") allege:

1.      Based on the Relators' personal knowledge and further investigation, sufficient evidence exists to allege that Defendants have violated and continue to violate the False Claims Act, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("Anti-Kickback Statute" or "AKS"), and

---

[1] Specific citations for relevant state *qui tam* statutes are as follows: California False Claims Act, Cal. Gov't Code § 12650 *et seq.*; Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304, *et seq.*; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a, *et seq.*; Florida False Claims Act, Fla. Stat. §68.081 *et seq.*; Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*; Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*; Illinois False Claims Act, 740 ILCS 175/1 *et seq.*; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*; Iowa False Claims Law, I.C.A. § 685.1 *et seq.*; Michigan's Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*; Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*; Montana False Claims Act, MCA § 17-8-401, *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*; New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et seq.*; New Jersey False Claims Act, N.J.S.A. § 2A:32C-1, *et seq.*; New Mexico Medicaid False Claims       Act,        N.M.       Stat.       Ann.       §       27-14-1        *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq*; New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*; Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; V.T.C.A. Hum. Res. Code § 36.001 *et seq.*; Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*; Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*; and District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-308.13 *et seq.*

the false claims acts of the respective Plaintiff States, by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of kickbacks provided to referring physicians.

## PARTIES

2.      Jane Doe ("Relator 1") was employed as a district manager for Essilor's Brands Division.

3.      Jane Roe ("Relator 2") was employed as a district manager for Essilor's Laboratory Division.

4.      Plaintiff United States, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled, established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare").

5.      The Plaintiff States are the States of California, Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Tennessee, Texas, Wisconsin, and the Commonwealth of Massachusetts, and the District of Columbia.  They each bring claims for Essilor's violations of their respective state false claims acts, as set forth in detail in Counts II-XXIII.

6.      Defendant Essilor Int'l, a multibillion-dollar company, is a world leader for ophthalmic lenses, with more than 55,000 employees worldwide and presence in over 100 countries.  The Company's headline brands are Varilux®, Crizal®, Xperio®, Definity®, Optifog™ and Foster Grant®.  Essilor Int'l also develops and sells ophthalmic optical equipment for prescription laboratories.  Essilor Int'l was founded in 1971 and is headquartered in Paris,

3

France.

7.      Defendant Essilor of America is a fully owned subsidiary of Essilor Int'l and is the largest business unit in the worldwide Essilor Group.  Essilor of America is the leading manufacturer and wholesale distributor of optical lenses in the United States.  Throughout North America, Essilor of America has more than 8,500 dedicated employees located in 128 prescription laboratories, four manufacturing facilities, two distribution centers and one research and development center.  Essilor of America has two sales divisions: Essilor Brands and Essilor Labs.  Essilor Labs primary role is business acquisition.  Essilor Brands' primary role is the growth of Essilor's product brands.  Essilor of America is headquartered in Dallas, Texas.

8.      Defendant Essilor Labs, a subsidiary of Essilor of America, is the largest wholesale optical laboratory network in the United States providing services and a variety of lens brands to opticians, optometrists and ophthalmologists nationwide.

9.      In 1996, with the establishment of defendant Essilor Labs, Essilor became the first fully integrated optical company in the United States, specializing in ophthalmic lens production, manufacturing and distribution in addition to wholesale optical laboratory operations.  Essilor Labs is headquartered in Dallas, Texas.

## JURISDICTION AND VENUE

10.     Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

11.     The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. § 3729 *et seq*., and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

12.     Pursuant to 31 U.S.C. § 3730(b)(2), Relators prepared and will serve the Complaint on the Attorney General of the United States, and the United States Attorney for the Northern District of Texas, as well as a statement of all material evidence and information currently in its possession and of which it is the original source.  These disclosure statements are supported by material evidence known to the Relators at the time of filing establishing the existence of Defendants' false claims.  Because the statements include attorney-client communications and work product of Relators' attorneys, and will be submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relators understand these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act.  5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## **LEGAL BACKGROUND**

### *The False Claims Act*

13.     The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

> (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

> (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud

the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"—

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

14.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 C.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

*The Anti-Kickback Statute*

15.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A) and (B), prohibits offering to pay or paying any remuneration (including any kickback, bribe, or *rebate*) to any person to induce such person "to purchase . . . any good . . . service, or item for which payment may be made in whole or in part under a Federal healthcare program" or "to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." *Id.*

7

16.     Pursuant to the Anti-Kickback Statute, it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product or service (including optical lenses) for which payment is sought from any federally-funded health care program, including Medicare, Medicaid and TRICARE.   The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985), *cert denied*, 474 U.S. 988 (1985).   In order to ensure compliance, every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the Anti-Kickback Statute and other federal laws governing the provision of health care services in the United States.

17.     A violation of the Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both.   Any party convicted under the Anti-Kickback Statute must be excluded from federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7b(b).   The government may also assess civil money penalties, which could result in treble damages plus $50,000 for each violation of the Anti-Kickback Statute. 42 U.S.C §§ 1320a-7a(a)(7) and (10).

18.     Importantly, although the Anti-Kickback Statute does not afford a private right of action, the False Claims Act provides a vehicle whereby individuals may bring *qui tam* actions alleging violations of the Anti-Kickback Statute. *See* 31 U.S.C. § 3729 *et seq.*

19.     Compliance with the Anti-Kickback Statute is required for reimbursement of claims from federal health care programs, and claims made in violation of the law are actionable civilly under the FCA. 42 U.S.C. § 1320a-7b(g) (2010) (stating, in part, that a "claim that includes items or services resulting from a violation of . . . [the Anti-Kickback Statute] constitutes a false

or fraudulent claim for purposes of [the FCA]. . . ."); *see also United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 315 (3d Cir. 2011) (stating "[c]ompliance with the AKS is clearly a condition of payment under Parts C and D of Medicare" and holding that "appellants, by alleging that appellees violated the AKS while submitting claims for payment to a federal health insurance program, have stated a plausible claim for relief under the FCA.").

20.     The Anti-Kickback Statute was amended in March 2010 as part of the Patient Protection and Affordable Care Act ("PPACA"), which clarified that all claims resulting from a violation of the Anti-Kickback Statute are also a violation of the FCA. 42 U.S.C. § 1320a-7(b)(g). The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of its anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." Public Law No. 111-148, § 6402(h).

### *The Stark Law*

21.     The Stark Law, 42 U.S.C. § 1395nn *et seq.* (the "Stark Law"), prohibits physicians from referring patients for Medicare or Medicaid covered designated health services to an entity with which the physician (or a family member of the physician) has a financial relationship (such as ownership, investments, or other compensation arrangements).  In addition, the Stark Law further prohibits an entity from presenting (or causing to be presented) a claim or bill to any individual, third party payor, or other entity for designated health services furnished in violation of the preceding sentence. The Stark Law contains an exception to its referral prohibition for eyeglasses and contact lenses following cataract surgery. 42 C.F.R. § 411.355(i).  However, the exception is only available so long as the arrangement does not violate the Anti-Kickback Statute or any other federal or state law or regulation governing billing or claims submission. *Id.* at (i)(2)

and (3).

## FACTUAL BACKGROUND

### I.      Overview of Medicare and Its Benefits

22.     Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.

23.     HHS, through its agency, CMS, administers the Medicare and Medicaid programs. CMS is authorized to enter into and administer contracts with insurance companies or Medicare contractors on behalf of HHS.  Inclusive in CMS's contracting authority is the responsibility for entering into contracts with health care providers and suppliers.

24.     Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage (usually 80 percent) of the fee schedule amount for physician and laboratory services, outpatient services and all other services not covered by Medicare Part A. Medicare Part B contractors process and pay claims for these services.

25.     Medicare Part B covers one pair of eye glasses or one set of contact lenses following each cataract surgery that implants an intraocular lens.  In addition, a Medicare policyholder who opts for a Medicare Advantage plan may have access to routine eye exams (including pupil dilation), eyeglass frames and one pair of eyeglass lenses or contact lenses every twenty four months.  *See* CMS Medicare Vision Services Fact Sheet.[2]

26.     A Medicare Advantage plan is an additional health plan option offered to those eligible for Medicare Part A and B.  These plans are a private insurance alternative to Original Medicare.  Medicare Advantage plans generally allow beneficiaries to get their Medicare Part A

---

[2]   *Available at* https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/VisionServices_FactSheet_ICN907165.pdf.

and B coverage through one plan. The Fraud Enforcement and Recovery Act expanded the scope of liability under the FCA to include false claims submitted to a Medicare Advantage plan.

## II.    Overview of Medicaid and Its Benefits

27.    Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

28.    The Medicaid program pays for services pursuant to plans developed by the states and approved by the HHS Secretary through CMS. 42 U.S.C. § 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily-established share of "the total amount expended . . . as medical assistance under the State plan . . . ." *See* 42 U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial participation.

29.    As a prerequisite to participating in state Medicaid programs, providers must expressly certify (or, through their participation in the state-funded health care program, impliedly certify) their compliance with federal and state laws governing Medicaid, including the federal Anti-Kickback Statute.

30.    Whether, and to what extent, Medicaid covers optical lenses depends on the particular state's Medicaid benefits. As of 2012, 41 states and the District of Columbia covered optical lenses as part of the Medicaid benefit.

### III. **The TRICARE Program**

31.     TRICARE, formerly known as Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), is a managed health care program established by the United States Department of Defense. 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by the Defendants.

32.     TRICARE only covers contact lenses to treat certain conditions. Specifically, TRICARE covers: (1) lenses for patients with infantile glaucoma; (2) corneal or scleral lenses for treatment of keratoconus or to reduce corneal irregularities other than astigmatism; (3) scleral lenses to retain moisture when normal tearing is not present or is inadequate; and (4) intraocular lenses, contact lenses, or glasses for loss of human lens function resulting from intraocular surgery, ocular injury or congenital absence. *See* TRICARE Vision Benefits Fact Sheet.[3]

### III. **Defendants' Fraudulent Conduct**

#### A. **False Claims Act Violations**

33.     Defendants have, since at least 2013, engaged in an unlawful kickback scheme whereby providers were directly offered unlawful economic inducements, in the form of cash payments, in exchange for the providers' promise to: (1) order all of their optical lenses from Essilor; and (2) order a specified amount of Essilor products, with a 5% increase each year. Essilor provided these cash payments to providers under the guise of a "rebate paid in advance for future sales." This *quid quo pro* arrangement violates the Anti-Kickback Statute because it involves the

---

[3]     *Available for download at* http://www.tricare.mil/CoveredServices/Vision/GlassesContacts.aspx.

provision of financial benefits in return for referrals of business, which resulted in reimbursement from federal health care programs. As a result of this *quid quo pro* arrangement, claims for optical lenses, which were tainted by unlawful kickbacks, have been submitted to and paid by federal health care programs in violation of the FCA.

### 1. Essilor Provides Cash Payments to Physicians and Physician Practices to Unlawfully Induce Patient Referrals

34. Essilor gives physicians and physician practices large cash payments, under the guise of a "pre-paid rebate," in exchange for the physician's promise to order all of their patients' optical lenses from Essilor for the next five years. Essilor facilitates its unlawful scheme through, what the Company refers to as, its "Strategic Alliance" program.

35. Through Essilor's Strategic Alliance program, the Company enters into agreements with physician/optometrist/ophthalmologist practice owners (either directly or through their practices), whereby they agree to order all of their patients' ophthalmic lenses over the next five years from Essilor. In return for this promise, Essilor provides the physicians or physician practices with a large cash payment, and requires them to satisfy a revenue quota. The revenue quota represents the amount of revenue Essilor expects to receive from the practice each year during the five year agreement, which increases at a compounding rate of 5% per year. Provided that they met the revenue target, the practices would keep the cash payment.

36. According to Relators, Essilor targeted high volume optometrist/ophthalmologist practices to participate in the Strategic Alliance program. Once a physician practice is identified as a candidate for the Strategic Alliance program, an Essilor sales representative would visit the practice's office to discuss the program. The sales representative would then explain that, through the Strategic Alliance program, Essilor would provide the practice with what it called a pre-paid rebate (*i.e.* paid to the practice at the signing of the agreement) in exchange for the physician's or

practice's promise to order 100% of their lenses from Essilor for the next five years.

37.    If the physician or physician practice was interested in participating in the Strategic Alliance program, the sales representative would notify their District Sales Manager ("DSM") and Regional Sales Director ("RSD").  The RSD would then contact the physician practice and discuss the opportunity.  As part of this discussion, the RSD would review, in detail, the practice's lens purchase history.

38.    Once the account was turned over to the RSD, the sales representative and DSM had no involvement in the process, and only received an update once the physician practice and Essilor executed the agreement.

39.    Once the practice's lens purchase history was determined, Essilor provided this information to its finance department.  The finance department would then use a formula to determine how much profit the Company could expect to receive from the practice over the next five years if it were to purchase all of its lenses from Essilor.  This projected profit, of course, took into account that the revenue from the practice would increase at an annual compounding rate of 5%.  Using this figure, Essilor's finance department could determine how large of a cash payment it could provide the practice for agreeing to purchase all of its lenses from Essilor.  After the Company's finance department had calculated the amount to be offered to the provider, the RSD would communicate the offer to the provider.

40.    The amount of the kickback provided to physician practices depended on the amount of new business the practice could be expected to bring Essilor on a yearly basis as well as the amount of profit Essilor would make from lenses ordered by the practice.  In other words, the higher volume/value the practice, the larger the kickback they were provided.  According to Relators, physician practices typically received cash payments of between $50,000 and $250,000.

41.     In some instances, the amount offered was not enough to convince the physician to send all of his or her lens orders to Essilor.  In such instances, the RSD would request that the Company's finance team review the practice's purchase history again to see if Essilor could offer more money.  According to Relators, there were instances where, even after Essilor's finance team reviewed the practice's purchase history, they were unable to present an offer large enough to convince the practice to order all of its lenses from Essilor.  If the Company's offer was sufficient to induce the physician to enter into a "Strategic Alliance" with the Company, then Essilor's legal department would prepare the Strategic Alliance agreement between Defendants and the provider.

42.     For example, a Strategic Alliance contract between Essilor and Spex Expressions ("Spex"), in Sycamore, Illinois, was provided by Relators.  The agreement states, in relevant part:

   a) A $100,000 Prepaid Performance Rebate will be paid to Spex Expressions from Essilor, in total, up-front, upon the signing of the Strategic Alliance Letter Agreement.

     a. No repayment of the Prepaid Performance Rebate is required provided Essilor lab services minimum annual purchase amounts, as described below, are met by Spex Expressions:

       i. In RX Lab Purchases through ELOA:

| Year | Annual Minimum Purchase Target |
|------|-------------------------------|
| 1 | $250,000 |
| 2 | $262,500 |
| 3 | $275,600 |
| 4 | $289,400 |
| 5 | $303,900 |

     b. The Prepaid Performance Rebate will be amortized equally over 5 years ($20,000) and considered "Earned" so long as the minimum lab RX purchase targets above are met.

     c. Performance of the agreement obligations will be reviewed on an annual basis. If obvious disparity in the achievement of the goals is noted on any internal

quarterly review, Essilor and Spex Expressions will meet and decide a course of action to bring the goals back in line with agreement. Failure to meet minimum targets could potentially result in required repayment of that year's amortized portion of the Prepaid Performance Rebate.

b) The length of the agreement for lab services is 5 years.

c) Essilor Labs will be the exclusive provider of lab services for Spex Expressions.

d) Proposal terms good for 60 days after receipt.

43.    As is clear from the above, Essilor is providing physicians and physician practices with lump sums of cash in exchange for their promise to use Essilor as their exclusive provider of lenses for five years.

44.    According to Relators, in order to keep the "pre-paid rebate," Essilor required the physician or physician practice to meet a quota for lens orders. The quota was represented as a dollar figure, and was not based upon how many orders were actually sent to Essilor. In order to determine the practice's quota, Essilor representatives would request that the practice provide information regarding the amount of lenses the practice historically ordered for their patients. Using this number, and presuming all future orders would go to Essilor, the Company would create a quota, expressed in dollars, that the practice was required to provide to Essilor for the first year of the agreement. For every subsequent year, the quota amount grew at a rate of 5%, compounded.

45.    According to Relators, these payments were a mechanism Essilor used to share a portion of the profits it anticipated it would receive from the practice over the next five years with the physicians in advance. According to Relator 2, her RSD told her that the Strategic Alliance program was necessary for Essilor's sales team to beat out competition from independent and partner laboratories.

46.    An independent laboratory is an optical lens laboratory in which Essilor does not have an ownership interest. A partner laboratory is an optical lens laboratory in which Essilor has

a majority ownership interest.

47.    According to Relator 2, Essilor sold its lenses to independent and partner laboratories at a discounted rate. Moreover, Essilor set a threshold for the lowest price its sales representatives were allowed to sell its lenses. As a result, it was difficult for Essilor sales representatives to compete with independent and partner laboratories because they could, and in many cases would, sell the Essilor lenses below the lowest price at which Essilor sales representatives were permitted to sell the same lenses.

48.    To overcome this, Relator 2's RSD explained to her that the only way for Essilor sales representatives to compete was to find out what the practice's "needs" were. Relator 2 was instructed by her RSD and an Essilor Vice President to find out what practices wanted so that Essilor could try to provide it in exchange for their business. To accomplish this, Relator 2 states that sales representatives were instructed to call on physician practices and talk, generally, about what they would like to change about their practice or what they needed to improve their practice. In many instances, this would lead to a conversation about the practice's desire for additional equipment or improved office conditions.

49.    During Relator 2's time with Essilor, her RSD repeatedly explained to her that if their sales team attempted to sell lenses, they would lose. Rather, he explained that the job of sales representatives was to "define the practice's needs and use Essilor programs to fulfill those needs." Indeed, Relator 2's RSD further explained that the most important resource Essilor had was money and it was important for Relator 2 to ensure that her sales team understood that their job was to define needs and find ways to meet those needs through Essilor programs such as the Strategic Alliance Program.

50.    It was for purposes such as these that Essilor purportedly provided a "pre-paid

rebate." However, Relators state that the cash payments to physician practices could be used for anything, such as a vacation, and nobody from Essilor ever checked, or cared, to make sure the funds were being used for their supposed stated purpose. Indeed, according to Relators, physician practices were free to use the money for whatever they wanted. Relator 2's RSD also explained to her that it was important for her sales team to use the words "pre-paid rebate", because Essilor's pitch was that the payment was a profit-sharing mechanism whereby the Company would share part of the profit that the Company would gain from the new business the practice would provide. Relator 2's RSD was very forceful and direct in his wording that sales representatives must use the word "pre-paid rebate" to avoid the payment being viewed as a kickback. Furthermore, Relator 2's RSD stated that Essilor was able to do this as the majority of the new business would be from private insurance companies, so there would be no issues with government. This, of course, is inconsistent with his directive that sales representatives call the kickback a "pre-paid rebate" because, if the new business was actually from patients with private health care insurance, there would be no reason to disguise the kickbacks as "pre-paid rebate."

51.     It is beyond credible dispute that Essilor was aware that its practice of providing cash payments to physician practices was illegal because Essilor tried to conceal the fact that the cash payments it was providing to physicians were, in fact, kickbacks to compel referrals. For example, according to Relators, Essilor instructed its sales representatives and DSMs that they were never to refer to the cash payments as a "gift." Instead, they were to refer to the payments as a "pre-paid performance rebate," or a "20% forgiven loan."

52.     Although the payments made to physician practices were to induce referrals, in some instances, the payment was referred to as a loan. This was separate from the Strategic Alliance program, but operated similarly. Through this "loan program," Essilor would provide

practices with a lump sum payment in return for the practice's promise to order all of its lenses from Essilor. Similar to the Strategic Alliance program, the agreement lasted five years and the practice had to fulfill a yearly quota. Essilor would explain to physician practices that after each year, if the contractually determined quota was met, Essilor would forgive 20% of the "loan" (*i.e.* kickback).

53. Below is a list of eyecare providers, known to Relators, which entered Strategic Alliance agreements with Essilor:

    a) Spex Expressions; Location: Sycamore, IL; Payment Amount: $100,000;

    b) Blaine Family Eyecare; Location: Blaine, MN; Payment Amount: $100,000;

    c) Occhiali Eye Care; Location: Chicago, IL; Payment Amount: $50,000; and

    d) Oakbrook Optical Eyecare; Location: Oak Brook, IL; Amount: $100,000.

54. Claims for Essilor's optical lenses were submitted to and reimbursed by federal health care programs, including Medicare, Medicaid and TRICARE, and therefore were issued in violation of the Anti-Kickback Statute, the Stark Law, and the FCA. As a result of Defendants' misconduct, the Government has been defrauded and suffered a substantial loss.

### 2. Other Financial Inducements Provided by Essilor

55. In addition to the large cash payments discussed above, Essilor also has numerous other programs to provide financial benefits to physician practices to induce their referrals that violate the AKS. According to Relators, Essilor's business model is premised upon using program inducements to gain business. These programs are discussed in more detail, below.

#### a. Gift Cards

56. Essilor gives its sales representatives gift cards to provide to physician practices and non-Essilor laboratories to induce them to order Essilor's lenses. According to Relator 1,

Essilor provided her with thousands of dollars of gift cards, and her manager instructed her to provide them to laboratories and physician practices to "keep them happy." The gift cards differed in value – ranging from $25 to as high as $100 and could total $1000 with multiple cards. Initially, Realtor 1 was told these gift cards were to be given out to sales representatives when they did a good job in the field, but, in reality, rewarding the Company's sales representatives was not the intended use of the gift cards. Rather, sales representatives were instructed to provide gift cards to laboratory staff and optometrists/opticians to keep them happy and continue ordering Essilor lenses. On one occasion, Relator 1 witnessed an Essilor sales representative giving a gift card to a laboratory customer service manager in exchange for a list of optometrists who were ordering Crizal Prevencia lenses.

57.   Relator 1 questioned her manager about the legality of providing gift cards to providers to induce referrals. In response, her manager stated that such conduct was most likely a violation, but Essilor is doing it too "so we can't turn them in."

**b.   Edge Program**

58.   Essilor also induced referrals through its Edge program, which was also known as the Loyalty Program. The program awards optometrists for their purchases of Essilor lenses (mostly Varilux family, Definity, and Crizal family lenses). The Edge program assigned a certain number of points ("Edgepoints"), which could be redeemed for cash, for each set of premium (rather than standard) lenses ordered by a practice. According to Relators, the amount of Edgepoints earned for selling one set of premium lenses equated to approximately $20. As long as the eye care practice said the points would be used for training, trade shows, etc., the points were then converted to cash and paid to the eye care practice. No follow up was conducted. On many occasions, Relator 1 witnessed office managers and staff redeem their Edgepoints for as

much as $6,000, in just one quarter.

59.     Essilor also conducted training sessions in Texas, called ECP University, for dispensing managers and other staff of a practice where they trained those attending on Essilor lenses and trained ophthalmologists and office staff how to upsell their patients.  For those who enrolled in the program, they received gift cards in the amount of $25.

60.     Sales representatives were also instructed to promote Edgepoints when calling on physicians and physician practices.  According to Relators, sales representatives would calculate the reimbursement rates for premium lenses and show the doctors where they could maximize the spread by upselling their clients.  The sales representatives then set growth goals for the office and rewarded them with Edgepoints for each pair of the premium lenses.  If the office hit the monthly goal, they could redeem the Edgepoints for cash.

### c.     Essilor Promise Labs

61.     Essilor's Promise Labs program ("Promise Labs Program") also provided financial benefits to providers to induce referrals.  The Promise Labs Program guaranteed providers that, if they used an Essilor Promise laboratory for their lens orders, the provider's order would be delivered within a set period of time.  If Essilor failed to deliver the provider's order within that time period, then the provider would receive a credit that could be applied to future orders.

62.     For example, if delivery of the order was delayed, and Essilor notified the provider of the delay within a certain period of time, the provider received a credit ranging from $10-$30 depending on the order.  In addition, if the provider was not notified that the order would not arrive on time, or if the order was not shipped within 10 normal business days, the provider would receive a credit worth 100% of the order.

63.     Not all Essilor laboratories were "Promise Labs."  However, it was Essilor's goal

that all of their owned labs would eventually become Promise Labs.

64.     Although the Promise Labs Program, by the program's rules, does not cover orders from government health care programs, Essilor has no mechanism to ensure that the credits it gives to providers are not for orders reimbursed by government health care programs.  Rather, per the program's rules, it is the responsibility of the provider to inform Essilor if an order is being reimbursed by a government health care program.  Upon information and belief, Essilor is aware that, despite its boilerplate disclaimer, credits are provided through the Promise Labs Program for orders reimbursed by government health care programs.  Indeed, it is naïve, at best, to believe that providers, who otherwise would receive a credit that could be applied to future orders, would inform Essilor that no credit should be awarded in situations where the beneficiary is covered by a government health care program.  Thus, Essilor allows itself to be willfully ignorant to its violations of the Anti-Kickback Statute.

### d.      Growth Financing Program

65.     According to Relator 1, Essilor also induced referrals through its Growth Financing Program. According to Relator 1, through the Growth Financing Program, a practice could obtain an interest free loan (*i.e.* Essilor would pay the interest on the loan) in return for agreeing to send all of their orders to Essilor laboratories.

### e.      Varilux Growth Challenge Program

66.     According to Relators, Essilor's Varilux Growth Challenge ("VGC") program awarded practices points, which could be redeemed for cash, for selling Varilux lenses. According to Relator 1, a sales representative would visit a physician practice and explain the program.  If the physician wanted to participate, an Essilor representative would work with the physician to set a sales goal for Varilux lenses.  If the provider reached the goal, they were awarded a set number

of points, and also received additional points for exceeding their goal. These points could then be redeemed for cash.

### f. Practice Builder Program

67. According to Relators, Essilor's Practice Builder program rewards providers for ordering Essilor's digital lenses or lenses with reflective coating. According to Relators, when a provider signed up for the Practice Builder program, a minimum threshold for Essilor orders was established (based upon their order history) and then after the threshold was met, the practice received cash back for all additional Essilor orders. Essilor had two standard practice builder programs: one was Antireflective program and the other was a digital program. Essilor sales representatives could also build a customer incentive program for an optical office so that it matched their growth needs.

68. According to Relator 2, providers were very reliant on the money provided through the Practice Builder program. For example, on one occasion, a practice office manager called Relator 2, around November, frantic that the practice did not have enough money in their Practice Builder account to pay for their office Christmas party.

### g. VSP Vision Care $10 Rebate Program

69. VSP Vision Care ("VSP") is one of the largest optical insurance plans in the United States. During Relators' time with Essilor, VSP started to open their own laboratories, pressuring providers to send their VSP orders to VSP laboratories, rather than Essilor laboratories. This took business away from Essilor.

70. To combat this, the Company offered patients a $10 rebate for all orders of Crizal-coated lenses covered by VSP insurance that was sent to an Essilor laboratory. In addition, the provider also received a $10 rebate for all VSP-covered orders sent to an Essilor laboratory. The

$10.00 payment for each VSP lens order was paid to the optical office as a credit on their monthly lab bill.

71.     Due to the business relationship between VSP and Essilor, the Company was very secretive about the rebates given to providers, as it wanted to prevent VSP from learning about the rebates.  As such, Essilor did not put the details of the VSP Rebate program for providers in writing, but rather relied on sales representatives to explain the program to providers, who would then convey the benefits to patients.

72.     Essilor had an internal point person for VSP and this individual would train customers, district managers and sales representatives how to print off "assigned fee reports" through Eyefinity for individual patients and identify how the office could upsell patients to increase their profitability. Indeed, the focus was on increasing customer costs, thereby increasing the profits of the optical practice and Essilor.

73.     Relator 1 witnessed, on several occasions, sales representatives asking practices to print off fee reports and walking them through the process step by step.  According to Relators, 90% of the time the patient's confidential medical records and personal information would not be redacted and was therefore visible to sales representatives.  This resulted in daily Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule violations.  Essilor would provide the practices with step-by-step instructions on how to print fee reports.  These instructions stated: (a) log in to eyefinity; (b) go to VSP link; (c) click on administration; (d) click on practice/doctor updates; (e) view your fees; (f) hit go; (g) click on the round bullet on the left side; and (h) view assigned fee report.

### 3.     Essilor Coached Physicians to "Upsell" to Their Patients

74.     According to Relators, Essilor would coach physicians on how to upsell patients its

premium, and more expensive, lenses, with little regard to the cost incurred by patients. As already noted, above, Essilor taught physicians how to prescribe premium lenses to patients. Due to the numerous programs described above, many of which provide financial benefits for ordering premium Essilor lenses, many physicians were willing to upsell their patients because of the financial incentive provided to them for doing so.

75.     Specifically, the training involved teaching physicians how to talk patients into ordering premium lenses "from the chair," and how to deal with any objections from the patients. According to Relators, Essilor taught physicians to recommend Essilor's premium lenses to their patients. The goal was to give the patient two choices but both were premium lenses. For example, one method taught to physicians was to recommend two different premium lenses for the patient – so the patient would feel as if they have a choice. However, Essilor trained physicians to avoid giving patients their real choice – whether to order basic or premium lenses.

76.     One example of such conduct is Essilor's Crizal Rewards Program. VSP would charge the patient $10.00 to add Crizal AR coatings to an order. Essilor would sign up optometrists to the Crizal Rewards Program and then mail the optometrist booklets of $10.00 rebates to give to their patients. Essilor told sales representatives to tell optometrists only to provide these $10.00 rebates if the patient was aware of the $10.00 VSP charge for adding Crizal coatings to their lenses. Sales representatives coached optometrists to present the $10.00 rebate as a "direct offer from their practice to the patient" and state that "Our practice wants to ensure you have the latest in technology with the best protection at no additional cost."

77.     The aforementioned conduct also occurred in connection with Essilor's VGC program. Sales representatives would pitch the VGC program to provider practices. If the practice was interested in the program, the sales representative would follow up as needed to assist with



the practices' program enrollment, growth goals, and strategy to achieve their goals. Essilor provided sales representatives with a VGC promotional packet to give the practice with the contract and enrollment forms included. These contracts were designed for 12 months.

78.    That the VGC was targeted at making sure eye care practices understood the *quid pro quo* is clear; the sales call script for sales representatives confirm as much. For example, two of the following scripts were used:

*Sales call 1*:  Sales representatives would state that "Essilor is committed to your practices long term growth and we want to reward you for your growth. Make sure someone in the office has a demo or has tried the Varilux S series to they can give a testimonial to the patient in the chair."

*Sales call 2*:  Sales representatives would review the practice's goals with the office and discuss what they needed to do to reach their goals (training and review of pricing for patients (net of incentives the office can earn)). In addition, the sales representative would teach the eye care practice how to address any objections from patients.

79.    Lastly, Essilor also encouraged physicians to "upsell" their patients through the Company's Xperio PERK promotion. This program was designed to increase sales of Essilor's Xperio lenses. Through this program, an eye care practice would receive a $10 kickback for each pair of Xperio lenses they prescribed to a patient.

80.    All programs discussed above also encouraged physicians to upsell premium lenses to their patients. Because many of the programs provided financial incentive for ordering premium lenses, physicians could benefit twice from convincing their patients to order Essilor's premium lenses – first because the premium lenses were more expensive, and again when they received the financial benefits through one of Essilor's programs for ordering premium lenses.

## COUNT I
### (False Claims Act, 31 U.S.C. § 3729 *et seq.*)

81.    Relators repeat each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

82.     As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare, Medicaid, and TriCare by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of kickbacks provided to referring physicians.

83.     By virtue of the acts described above, Defendants have violated:

(1)     31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)     31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3)     31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

84.     To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relators reallege that Defendants knowingly violated 31 U.S.C. §§ 3729(a)(1)-(2) and (a)(7) prior to amendment, by engaging in the above-described conduct.

85.     By reason of the foregoing, the United States has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

## <u>COUNT II</u>
**(California False Claims Act, Cal Gov't Code § 12650 *et seq.*)**

86.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

87.     This is a *qui tam* action brought by Relators on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code

§ 12650 *et seq.*

88.     Cal. Gov't Code § 12651(a) provides liability for any person who:

    (1)    knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

    (3)    conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

    (4)    is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

89.     Defendants violated Cal. Gov't Code § 12651(a) and knowingly caused false claims to be made, used and presented to the State of California by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government funded health care programs.

90.     The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' conduct, paid the claims submitted by health care providers and third party payers in connection therewith.

91.     Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of California in connection with Defendants' conduct. Compliance with applicable California statutes was also a condition of payment of claims submitted to the State of California.

92.     Had the State of California known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

93.     As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

94.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

95.     This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CALIFORNIA:

(1) Three times the amount of actual damages which the State of California has sustained as a result of Defendants' conduct;

(2) A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of California;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT III</u>
### (Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*)

96.   Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

97.   This is a *qui tam* action brought by Relators on behalf of the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*

98.   Colorado's Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*, provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c) Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

(d) Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(e) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

(f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property

to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"; ...

(g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

99.     Defendants violated the Colorado Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Colorado by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

100.    The State of Colorado, by and through the Colorado Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

101.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Colorado in connection with Defendants' conduct. Compliance with applicable Colorado statutes was also a condition of payment of claims submitted to the State of Colorado.

102.    Had the State of Colorado known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

103.    As a result of Defendants' violations of the Colorado Medicaid False Claims Act,

the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

104.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Colorado Medicaid False Claims Act on behalf of themselves and the State of Colorado.

105.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF COLORADO:

(1) Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Colorado;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Colorado Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.



## COUNT IV
**(Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*)**

106.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

107.    This is a *qui tam* action brought by Relators on behalf of the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*

108.    Conn. Gen. Stat. § 17b-301b imposes liability as follows:

(a) No person shall:

(1) Knowingly present, or cause to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

(2) Knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

(3) Conspire to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

(4) Having possession, custody or control of property or money used, or to be used, by the state relative to a medical assistance program administered by the Department of Social Services, and intending to defraud the state or willfully to conceal the property, deliver or cause to be delivered less property than the amount for which the person receives a certificate or receipt;

(5) Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the state relative to a medical assistance program administered by the Department of Social Services and intending to defraud the state, make or deliver such document without completely knowing that the information on the document is true;

(6) Knowingly buy, or receive as a pledge of an obligation or debt, public property from an officer or employee of the state relative to

33

a medical assistance program administered by the Department of Social Services, who lawfully may not sell or pledge the property; or

(7) Knowingly make, use or cause to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state under a medical assistance program administered by the Department of Social Services.

109.    Defendants violated the Connecticut False Claims Act and knowingly caused false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

110.    The State of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

111.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Connecticut in connection with Defendants' conduct. Compliance with applicable Connecticut statutes was also a condition of payment of claims submitted to the State of Connecticut.

112.    Had the State of Connecticut known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

113.    As a result of Defendants' violations of the Connecticut False Claims Act, the State

of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

114.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Connecticut False Claims Act on behalf of themselves and the State of Connecticut.

115.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CONNECTICUT:

(1) Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Connecticut;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT V
### (Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*)

116.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

117.    This is a *qui tam* action brought by Relators on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

118.    Fla. Stat. § 68.082(2) provides liability for any person who:

(a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

(c) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed-or paid.

119.    Defendants further violated Fla. Stat. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

120.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

121.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Florida in connection with Defendants' conduct. Compliance with applicable Florida statutes was also a condition of payment of claims submitted to the State of

Florida.

122.    Had the State of Florida known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

123.    As a result of Defendants' violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

124.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of themselves and the State of Florida.

125.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF FLORIDA:

(1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Florida;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT VI**
**(Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*)**

126.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

127.    This is a *qui tam* action brought by Relators on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*

128.    The Georgia False Medicaid Claims Act imposes liability on any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3) Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

(4) Has possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate of receipt;

(5) Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Georgia Medicaid program who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay, repay, or transmit money or property to the State of Georgia ....

129.    Defendants violated the Georgia False Medicaid Claims Act and knowingly caused false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

130.    The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

131.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Georgia in connection with Defendants' conduct. Compliance with applicable Georgia statutes was also a condition of payment of claims submitted to the State of Georgia.

132.    Had the State of Georgia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

133.    As a result of Defendants' violations of the Georgia False Medicaid Claims Act,

the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

134.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Georgia False Medicaid Claims Act on behalf of themselves and the State of Georgia.

135.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF GEORGIA:

    (1) Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Georgia;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168, and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT VII
**(Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*)**

136.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

137.    This is a *qui tam* action brought by Relators on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

138.    Section 661-21(a) provides liability for any person who-

    **a.**    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    **b.**    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    **c.**    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State; and

    **d.**    Conspires to commit any of the conduct described in this subsection,

139.    Defendants violated Haw. Rev. Stat. § 661-21(a) and knowingly caused false claims to be made, used and presented to the State of Hawaii by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

140.    The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

141.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Hawaii in connection with Defendants' conduct. Compliance with

applicable Hawaii statutes was also a condition of payment of claims submitted to the State of Hawaii.

142.    Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

143.    As a result of Defendants' violations of Haw. Rev. Stat. § 661-21, the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

144.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Haw. Rev. Stat. § 661-21 on behalf of themselves and the State of Hawaii.

145.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF HAWAII:

     (1) Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' conduct;

     (2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Hawaii;

     (3) Prejudgment interest; and

     (4) All costs incurred in bringing this action.

To Relators:

  (1) The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-21 and/or any other applicable provision of law;

  (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

  (3) An award of reasonable attorneys' fees and costs; and

  (4) Such further relief as this Court deems equitable and just.

### COUNT VIII
**(Illinois False Claims Act, 740 ILCS 175/1 *et seq.*)**

146. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

147. This is a *qui tam* action brought by Relators on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175/1 *et seq.*

148. 740 ILCS 175/3(a) provides liability for any person who:

  (1) knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

  (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

  (3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

149. Defendants violated 740 ILCS 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the

government-funded healthcare programs.

150.    The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

151.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Illinois in connection with Defendants' conduct. Compliance with applicable Illinois statutes was also a condition of payment of claims submitted to the State of Illinois.

152.    Had the State of Illinois known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

153.    As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

154.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the State of Illinois.

155.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants

To the STATE OF ILLINOIS:

(1)     Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Illinois;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT IX
**(Indiana False Claims and Whistleblower Protection Act, Ind. Code 5-11-5.5 *et seq.*)**

156.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

157.     This is a *qui tam* action brought by Relators on behalf of the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code 5-11-5.5 *et seq.*, which imposes liability on:

(b) A person who knowingly or intentionally:

(1) presents a false claim to the state for payment or approval;

(2) makes or uses a false record or statement to obtain payment or approval



of a false claim from the state;

(3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;

(4) with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

(5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

(6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

(7) conspires with another person to perform an act described in subdivisions (1) through (6); or

(8) causes or induces another person to perform an act described in subdivisions (1) through (6) ....

158.    Defendants violated Indiana False Claims Act and knowingly caused false claims to be made, used and presented to the State of Indiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

159.    The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

160.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Indiana in connection with Defendants' conduct. Compliance with applicable Indiana statutes was also a condition of payment of claims submitted to the State of Indiana.

161.    Had the State of Indiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

162.    As a result of Defendants' violations of Indiana's False Claims Act, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

163.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Ind. Code § 5-11-5.5 *et seq.* on behalf of themselves and the State of Indiana.

164.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF INDIANA:

    (1) Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Indiana;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to Ind. Code § 5-11-5.5 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT X**
**(Iowa False Claims Law, I.C.A. § 685.1 *et seq*.)**

165.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

166.    This is a *qui tam* action brought by Relators on behalf of the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Law, I.C.A. § 685.1 *et seq.*

167.    Iowa False Claims Law, I.C.A. § 685.2, in pertinent part provides for liability for any person who:

    (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

    (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

    (c) Conspires to commit a violation of paragraph "a", "b", "d", "e", "f", or "g".

168.    Defendants violated the Iowa False Claims Law, I.C.A. § 685.1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of Iowa by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

169.    The State of Iowa, by and through the Iowa Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

48

170.     Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Iowa in connection with Defendants' conduct. Compliance with applicable Iowa statutes was also a condition of payment of claims submitted to the State of Iowa.

171.     Had the State of Iowa known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

172.     As a result of Defendants' violations of the Iowa False Claims Law, I.C.A. § 685.1 *et seq.*, the State of Iowa has been damaged in an amount far in excess of millions of dollars exclusive of interest.

173.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq.*, on behalf of themselves and the State of Iowa.

174.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF IOWA:

(1) Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false

claim which Defendants caused to be presented to the State of Iowa;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XI
### (Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*)

175.   Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

176.   This is a *qui tam* action brought by Relators on behalf of the State of Michigan to recover treble damages and civil penalties under Michigan's Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*, which provides in pertinent part as follows:

> Sec. 3. (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits;
>
> (2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit ....

177.   Defendants violated Michigan law and knowingly caused false claims to be made, used and presented to the State of Michigan by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

178.   The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

179.   Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Michigan in connection with Defendants' conduct. Compliance with applicable Michigan statutes was also a condition of payment of claims submitted to the State of Michigan.

180.   Had the State of Michigan known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

181.   As a result of Defendants' violations of the Medicaid False Claims Act, the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

182.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Medicaid False Claims Act on behalf of themselves and the State of Michigan.

183.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MICHIGAN:

(1) Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Michigan;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to the Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XII
### (Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*)

184. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

185. This is a *qui tam* action brought by Relators on behalf of the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*

186. Minnesota False Claims Act, M.S.A. § 15C.02, provides for liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee

52



of the state or a political subdivision a false or fraudulent claim for payment or approval;

(2) knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;

(3) knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim;

(4) has possession, custody, or control of public property or money used, or to be used, by the state or a political subdivision and knowingly delivers or causes to be delivered to the state or a political subdivision less money or property than the amount for which the person receives a receipt;

(5) is authorized to prepare or deliver a receipt for money or property used, or to be used, by the state or a political subdivision and knowingly prepares or delivers a receipt that falsely represents the money or property;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state or a political subdivision who lawfully may not sell or pledge the property; or

(7) knowingly makes or uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or a political subdivision.

187.    Defendants violated the Minnesota False Claims Act and knowingly caused false claims to be made, used and presented to the State of Minnesota by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

188.    The State of Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

189.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Minnesota in connection with Defendants' conduct. Compliance with applicable Minnesota statutes was also a condition of payment of claims submitted to the State of Minnesota.

190.    Had the State of Minnesota known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

191.    As a result of Defendants' violations of the Minnesota False Claims Act, the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

192.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Minnesota False Claims Act on behalf of themselves and the State of Minnesota.

193.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MINNESOTA:

(1) Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Minnesota;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Minnesota False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XIII
### (Montana False Claims Act, MCA § 17-8-401 *et seq.*)

194.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

195.    This is a *qui tam* action brought by Relators on behalf of the State of Montana to recover treble damages and civil penalties under the Montana False Claims Act, MCA § 17-8-401, *et seq.*

196.    Montana's False Claims Act, MCA § 17-8-403, provides for liability for any person who:

(a) knowingly presents or causes to be presented to an officer or employee of the governmental entity a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the governmental entity;

(c) conspires to defraud the governmental entity by getting a false or fraudulent claim allowed or paid by the governmental entity;

(d) has possession, custody, or control of public property or money used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the property, delivers or causes to be delivered less property or money than the amount for which the person receives a certificate or receipt;

(e) is authorized to make or deliver a document certifying receipt of property used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the property, makes or delivers a receipt without knowing that the information on the receipt is true;

(f) knowingly buys or receives as a pledge of an obligation or debt public property of the governmental entity from any person who may not lawfully sell or pledge the property;

(g) knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors; or

(h) as a beneficiary of an inadvertent submission of a false or fraudulent claim to the governmental entity, subsequently discovers the falsity of the claim or that the claim is fraudulent and fails to disclose the false or fraudulent claim to the governmental entity within a reasonable time after discovery of the false or fraudulent claim.

197.    Defendants violated the Montana False Claims Act and knowingly caused false claims to be made, used and presented to the State of Montana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

198.    The State of Montana, by and through the Montana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

199.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of

claims submitted to the State of Montana in connection with Defendants' conduct. Compliance with applicable Montana statutes was also a condition of payment of claims submitted to the State of Montana.

200.    Had the State of Montana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

201.    As a result of Defendants' violations of the Montana False Claims Act, the State of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

202.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Montana False Claims Act on behalf of themselves and the State of Montana.

203.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MONTANA:

     (1) Three times the amount of actual damages which the State of Montana has sustained as a result of Defendants' conduct;

     (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Montana;

     (3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to Montana False Claims Act and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT XIV
### (Nevada False Claims Act, N.R.S. § 357.010 *et seq.*)

204.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

205.    This is a *qui tam* action brought by Relators on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010 *et seq.*

206.    N.R.S. § 357.040(1) provides liability for any person who -

    (a) knowingly presents or causes to be presented a false claim for payment or approval;

    (b) knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

    (c) conspires to defraud by obtaining allowance or payment of a false claim;

    (h) is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

207.    Defendants violated N.R.S. § 357.040(1) and knowingly false claims to be made, used and presented to the State of Nevada by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct

were even eligible for reimbursement by the government-funded healthcare programs.

208. The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

209. Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Nevada in connection with Defendants' conduct. Compliance with applicable Nevada statutes was also a condition of payment of claims submitted to the State of Nevada.

210. Had the State of Nevada known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

211. As a result of Defendants' violations of N.R.S. § 357.040(1), the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

212. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.R.S. § 357.080(1) on behalf of themselves and the State of Nevada.

213. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request that this Court award the following damages to the following parties and against Defendants:

To the STATE OF NEVADA:

(1) Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $2,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Nevada;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XV
### (Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et seq.*)

214.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

215.    This is a *qui tam* action brought by Relators on behalf of the State of New Hampshire to recover treble damages and civil penalties under the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et seq.*, which provides that:

I.      Any person shall be liable who...

(a) knowingly presents, or causes to be presented, to an officer or employee of the State, a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or

statement to get a false or fraudulent claim paid or approved by the State;

(c) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

216.    Defendants violated N.H. Rev. Stat. Ann. §167:61-b *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Hampshire by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

217.    The State of New Hampshire, by and through the New Hampshire Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

218.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Hampshire in connection with Defendants' conduct. Compliance with applicable New Hampshire statutes was also a condition of payment of claims submitted to the State of New Hampshire.

219.    Had the State of New Hampshire known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

220.    As a result of Defendants' violations of N.H. Rev. Stat. Ann. §167:61-b *et seq.*, the State of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive of interest.

221.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.H. Rev. Stat. Ann. §167:61-b *et seq.* on behalf of themselves and the State of New Hampshire.

222.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Hampshire in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW HAMPSHIRE:

> (1) Three times the amount of actual damages which the State of New Hampshire has sustained as a result of Defendants' conduct;
>
> (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Hampshire;
>
> (3) Prejudgment interest; and
>
> (4) All costs incurred in bringing this action.

To Relators:

> (1) The maximum amount allowed pursuant to N.H. Rev. Stat. Ann § 167:61-b and/or any other applicable provision of law;
>
> (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;
>
> (3) An award of reasonable attorneys' fees and costs; and
>
> (4) Such further relief as this Court deems equitable and just.

### COUNT XVI
### (New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*)

223.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

224.    This is a *qui tam* action brought by Relators on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*

225.    N.J.S.A. § 2A:32C-3, provides for liability for any person who:

(a) Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

(d) Has possession, custody, or control of public property or money used or to be used by the State and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

(e) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the entity, makes or delivers a receipt without completely knowing that the information on the receipt is true;

(f) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property; or

(g) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

226.    Defendants violated the New Jersey False Claims Act and knowingly caused false claims to be made, used and presented to the State of New Jersey by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

227.    The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

228.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Jersey in connection with Defendants' conduct. Compliance with applicable New Jersey statutes was also a condition of payment of claims submitted to the State of New Jersey.

229.    Had the State of New Jersey known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

230.    As a result of Defendants' violations of the New Jersey False Claims Act, the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

231.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the New Jersey False Claims Act on behalf of themselves and the State of New Jersey.

232.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendants:

To the STATE OF NEW JERSEY:

    (1) Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of New Jersey;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to New Jersey False Claims Act and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT XVII
**(New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*)**

233.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

234.    This is a *qui tam* action brought by Relators on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act, which provides in pertinent part as follows:

A person shall not:

    (1) knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee, or other recipient of state funds, a false or fraudulent claim for payment or approval;

    (2) knowingly make or use, or cause to be made or used, a false, misleading

or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

(3) conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim ....

N.M. Stat. Ann. § 44-9-3(A)(1)-(3).

235.    Defendants violated N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Mexico by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

236.    The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

237.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Mexico in connection with Defendants' conduct. Compliance with applicable New Mexico statutes was also a condition of payment of claims submitted to the State of New Mexico.

238.    Had the State of New Mexico known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

239.    As a result of Defendants' violations of N.M. Stat. Ann. §§ 27-14-1 *et seq.* and

N.M. Stat. Ann. § 44-9-1 *et seq.*, the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

240.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* on behalf of themselves and the State of New Mexico.

241.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW MEXICO:

    (1) Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT XVIII
**(New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*)**

242.   Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

243.   This is a *qui tam* action brought by Relators on behalf of the State of New York to recover treble damages and civil penalties under the New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*, which imposes liability on any person who:

(a)   knowingly presents, or causes to be presented, to any employee, officer or agent of the state or local government, a false or fraudulent claim for payment or approval;

(b)   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or local government; or

(c)   conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

244.   Defendants violated the New York State False Claims Act, and knowingly caused false claims to be made, used and presented to the State of New York, by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

245.   The State of New York, by and through the New York Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

246.   Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New York in connection with Defendants' conduct. Compliance with applicable New York statutes was also a condition of payment of claims submitted to the State of New York.

247. Had the State of New York known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

248. As a result of Defendants' violations of the New York State False Claims Act, the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

249. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the New York State False Claims Act, on behalf of themselves and the State of New York.

250. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW YORK:

    (1) Three times the amount of actual damages which the State of New York has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New York;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

  (1) The maximum amount allowed pursuant to the New York State False Claims Act, and/or any other applicable provision of law;

  (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

  (3) An award of reasonable attorneys' fees and costs; and

  (4) Such further relief as this Court deems equitable and just.

## COUNT XIX
### (Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*)

251.   Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

252.   This is a *qui tam* action brought by Relators on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

253.   Section 71-5-182(a)(1) provides liability for any person who:

  **a.**   presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

  **b.**   makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

  **c.**   conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

254.   Defendants violated Tenn. Code Ann. § 71-5-1 82(a)(1) and knowingly caused false claims to be made, used and presented to the State of Tennessee by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

255.   The State of Tennessee, by and through the Tennessee Medicaid program and other

state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

256.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Tennessee in connection with Defendants' conduct. Compliance with applicable Tennessee statutes was also a condition of payment of claims submitted to the State of Tennessee.

257.    Had the State of Tennessee known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

258.    As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

259.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of themselves and the State of Tennessee.

260.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TENNESSEE:

    (5) Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendants' conduct;

    (6) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Tennessee;

    (7) Prejudgment interest; and

    (8) All costs incurred in bringing this action.

To Relators:

    (5) The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

    (6) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (7) An award of reasonable attorneys' fees and costs; and

    (8) Such further relief as this Court deems equitable and just.

## COUNT XX
### (Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*)

261.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

262.    This is a *qui tam* action brought by Relators on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

263.    V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who –

(1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

    (a) on an application for a contract, benefit, or payment under the Medicaid program; or
    (b) that is intended to be used to determine its eligibility for a benefit or payment under the Medicaid program

(2) knowingly or intentionally concealing or failing to disclose an event:

    (a) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of:

        (i) the person, or

        (ii) another person on whose behalf the person has applied     for   a benefit or payment or is receiving a benefit or payment; and

    (b) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;

*   *   *

(4) knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

*   *   *

    (b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5) knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service provided to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program.

264.    Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

265.    The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

266.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Texas in connection with Defendants' conduct. Compliance with applicable Texas statutes was also a condition of payment of claims submitted to the State of

73

Texas.

267.    Had the State of Texas known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

268.    As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

269.    Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and has not otherwise furnished information to the State regarding the claims for reimbursement at issue.

270.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of themselves and the State of Texas.

271.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TEXAS:

(1) Two times the amount of actual damages which the State of Texas has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $10,000 pursuant to V.T.C.A. Hum. Res. Code § 36.025(a)(3) for each false claim which Defendants cause to be presented to the state of Texas;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XXI**
**(Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*)**

272.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

273.    This is a *qui tam* action brought by Relators on behalf of the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*

274.    The Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.* provides for liability for any person who:

(a) Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.
(b) Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.

(c) Conspires to defraud this state by obtaining allowance or payment of a

false claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program.

\*   \*   \*

Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance program.

(g) Is a beneficiary of the submission of a false claim for medical assistance to any officer, employee, or agent of this state, knows that the claim is false, and fails to disclose the false claim to this state within a reasonable time after the person becomes aware that the claim is false.

275.    Defendants violated the Wisconsin False Claims Act and knowingly caused false claims to be made, used and presented to the State of Wisconsin by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

276.    The State of Wisconsin, by and through the Wisconsin Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

277.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Wisconsin in connection with Defendants' conduct. Compliance with applicable Wisconsin statutes was also a condition of payment of claims submitted to the State of Wisconsin.

278.    Had the State of Wisconsin known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were

premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

279.    As a result of Defendants' violations of the Wisconsin False Claims Act, the State of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

280.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Wisconsin False Claims Act on behalf of themselves and the State of Wisconsin.

281.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Wisconsin in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF WISCONSIN:

(1) Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Wisconsin;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Wisconsin False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XXII
**(Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap. 12 § 5(A) *et seq.*)**

282.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

283.    This is a *qui tam* action brought by Relators on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap. 12 § 5(A) *et seq.*

284.    Mass. Gen. Laws Ann. Chap. 12 § 5B provides liability for any person who-

  (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

  (2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth; or

  (3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

  *  *  *

  (9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

285.    Defendants violated Mass. Gen. Laws Ann. Chap. 12 § 5B and knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

286.    The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims

submitted by healthcare providers and third party payers in connection therewith.

287. Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendants' conduct. Compliance with applicable Massachusetts statutes was also a condition of payment of claims submitted to the Commonwealth of Massachusetts.

288. Had the Commonwealth of Massachusetts known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

289. As a result of Defendants' violations of Mass. Gen. Laws Ann. Chap. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

290. Relators are private persons with direct and independent knowledge of the allegations in this Complaint, who have brought this action pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5(c)(2) on behalf of themselves and the Commonwealth of Massachusetts.

291. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the Commonwealth OF MASSACHUSETTS:

> (1) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendants' conduct;
>
> (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Massachusetts;
>
> (3) Prejudgment interest; and
>
> (4) All costs incurred in bringing this action.

To Relators:

> (1) The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12, §5F and/or any other applicable provision of law;
>
> (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;
>
> (3) An award of reasonable attorneys' fees and costs; and
>
> (4) Such further relief as this Court deems equitable and just.

## COUNT XXIII
### (District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-308.13 *et seq.*)

292.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

293.    This is a *qui tam* action brought by Relators and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-308.13 *et seq.*

294.    D.C. Code § 2-308.14(a) provides liability for any person who-

> (1) knowingly presents, or causes to be presented, to an officer or employee of the District, a false claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;



(3) conspires to defraud the District by getting a false claim allowed or paid by the District;

* * *

is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

295.    Defendants violated D.C. Code § 2-308.14(a) and knowingly caused false claims to be made, used and presented to the District of Columbia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the government-funded healthcare programs.

296.    The District of Columbia, by and through the District of Columbia Medicaid program and other District healthcare programs, and unaware of Defendants' illegal conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

297.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the District of Columbia in connection with Defendants' conduct. Compliance with applicable District of Columbia statutes was also a condition of payment of claims submitted to the District of Columbia.

298.    Had the District of Columbia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

299.    As a result of Defendants' violations of D.C. Code § 2-308.14(a), the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

300.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of themselves and the District of Columbia.

301.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the DISTRICT OF COLUMBIA:

(1) Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' illegal conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the District of Columbia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## JURY TRIAL DEMANDED

302.     Relators demand a jury trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Relators pray that the Court enter judgment against Defendants as follows:

(a)    that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, provides;

(b)    that civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim;

(c)    that attorneys' fees, costs, and expenses that Relators necessarily incurred in bringing and pressing this case be awarded;

(d)    that Relators be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(e)    that this Court order such other and further relief as it deems proper.

DATED: September 1, 2015

Respectfully submitted,

**KENDALL LAW GROUP, LLP**

By: _Joe Kendall_

JOE KENDALL
Texas Bar No. 11260700
JKENDALL@KENDALLLAWGROUP.COM
JODY RUDMAN
Texas Bar No. 00797356
JRUDMAN@KENDALLLAWGROUP.COM
JAMIE J. MCKEY
Texas Bar No. 24045262
JMCKEY@KENDALLLAWGROUP.COM
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204
Telephone: (214) 744-3000
Facsimile: (214) 744-3015

**THE WEISER LAW FIRM, P.C.**
CHRISTOPHER L. NELSON
CLN@WEISERLAWFIRM.COM
JAMES M. FICARO
JMF@WEISERLAWFIRM.COM
ROSS M. WOLFE
RMW@WEISERLAWFIRM.COM
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062

*Attorneys for Relators*